Filed 5/19/15  Pringle v. C.B. Richard Ellis, Inc. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| JOHN B. PRINGLE, as Trustee in Bankruptcy, etc., | B250304 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SC098884) |
| v. | |
| C.B. RICHARD ELLIS, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, H. Chester Horn, Jr., Judge.  Reversed.

Cheong, Denove, Rowell & Bennett and John D. Rowell for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, William John Rea, Jr., Julie Veltkamp, Allison A. Arabian, Caroline E. Chan and Christina M. Guerin for Defendant and Respondent.

\* \* \* \* \* \*

Plaintiff Aniko Kaye[1] appeals from the judgment rendered after the trial court granted the summary judgment motion of defendant C.B. Richard Ellis (CBRE). In July 2004, Kaye purchased a property from the Parklane Group, LLC (Parklane) that straddled the border of Los Angeles and Beverly Hills. The property is located at 484 South Roxbury Drive, Beverly Hills (the Roxbury property). CBRE acted as Parklane's real estate broker and agent in the transaction.

Kaye brought this action for alleged misrepresentations CBRE made about the Roxbury property's rent control status and the condition of the property's heating, ventilating, and air conditioning (HVAC) system.[2] We reverse the judgment with directions to enter a summary adjudication order because CBRE was entitled to prevail on only one of these issues—the alleged misrepresentations about the rent control status.

**FACTS AND PROCEDURE**

*1. Allegations of the Complaint*

Kaye filed the original complaint on July 7, 2008. The operative complaint is the third amended complaint (TAC), which alleged as follows. CBRE marketed the Roxbury property as a Beverly Hills property and represented to Kaye that the Roxbury property was subject to the rent control ordinances of Beverly Hills. In December 2006, approximately two years after purchasing the Roxbury property, Kaye discovered the property was, in fact, situated in the City of Los Angeles for purposes of rent control ordinances. In 2008, Kaye obtained information from the City of Los Angeles indicating the Roxbury property had been registered as a Los Angeles property and Parklane had paid local taxes and fees to Los Angeles until at least 2003. Kaye was forced to register the Roxbury property with Los Angeles and pay back taxes and late fees.

---

[1] Kaye filed bankruptcy after bringing this action. In October 2011, the trial court substituted the trustee of her bankruptcy estate, John B. Pringle, as the plaintiff. For ease of reference, we will continue to refer to Kaye as the plaintiff.

[2] Kaye also named Parklane as a defendant, but Parklane is not a party to this appeal.

CBRE knew the Roxbury property was subject to the rent control ordinances of Los Angeles, not Beverly Hills, when Kaye bought the property. Agents of CBRE convinced an employee of the City of Beverly Hills to write a letter stating the Roxbury property was under the rent control ordinances of Beverly Hills, even though that employee did not have the proper authority or knowledge to do so.

CBRE included this letter in a package of due diligence materials provided to Kaye. CBRE also made representations about its high stature and respect in the real estate brokerage community and its knowledge and authority regarding rent control ordinances. The voluminous information CBRE provided in the due diligence package of materials was so definitive that it was reasonable for Kaye to have relied on CBRE's representations about the location of the property.

The location of the Roxbury property was a material fact. The location of the property in Los Angeles as opposed to Beverly Hills significantly diminished Kaye's ability to profit from rent because the rent control ordinances of Beverly Hills are more liberal than those of Los Angeles. She would not have purchased the Roxbury property for the amount she paid, or would not have purchased it at all, had she known it was subject to the rent control ordinances of Los Angeles.

When Kaye purchased the Roxbury property, CBRE also represented that the property was free of defects and included a fully functioning HVAC system. Shortly after Kaye bought the property, the tenants complained that the HVAC system was not functioning properly. They said it had not been functioning properly since before her purchase, and they had complained to Parklane about it. CBRE knew the Roxbury property had a defective HVAC system when Kaye purchased the property. Kaye was unable to inspect the condition of the HVAC system because of the limited time provided during escrow. CBRE assured her there was no need to inspect the HVAC system.

Based on the above allegations, the TAC alleged causes of action for breach of contract, negligence, negligent misrepresentation, fraud and deceit, and intentional misrepresentation. The subject of the breach of contract was the "Buyer's Inspection Advisory" portion of the purchase agreement, which provided: "Seller is required to

disclose to you material facts known to him/her that affect the value or desirability of the Property."

## 2. *Summary Judgment Evidence*

According to CBRE's motion for summary judgment, CBRE had previously filed a demurrer to the breach of contract cause of action, which the court sustained. CBRE moved for summary judgment on the remaining causes of action on several grounds. First, it argued the applicable statutes of limitations barred the causes of action. Second, it argued that it did not misrepresent the state of rent control jurisdiction because Beverly Hills did, in fact, have jurisdiction over the Roxbury property at the time Kaye purchased the property. Third, it argued Kaye was estopped from claiming CBRE misrepresented the state of rent control jurisdiction because she made a purportedly inconsistent argument in an unrelated case in which she was a defendant, *Sharp v. Kaye* (Super. Ct. L.A. County, 2010, No. BC381214) (the *Sharp* action).

The evidence on which CBRE relied in moving for summary judgment consisted primarily of three documents from the *Sharp* action. CBRE requested that the court take judicial notice of these documents. The documents consisted of a trial brief and answer filed by Kaye and the court's ruling on phase one of the trial in the *Sharp* action. CBRE contended Kaye made critical admissions in these documents from the *Sharp* action.

## a. **Trial Brief in *Sharp* Action**

According to Kaye's trial brief, the *Sharp* action consolidated seven complaints filed by tenants of the Roxbury property. The tenants claimed Kaye violated the Los Angeles Rent Stabilization Ordinance (L.A. Mun. Code, ch. XV, art. I, § 151.00 et seq.) (RSO), among other things. The court bifurcated trial and ordered the claims related to the RSO tried first. Kaye's trial brief stated the Roxbury property was located on the border between Los Angeles and Beverly Hills, with approximately two-thirds of the building on the Los Angeles side, and one-third on the Beverly Hills side. Kaye argued that "[h]istorically there has been confusion over which city has jurisdiction for purposes of rent control." Moreover, Kaye argued she was not liable for violations of the RSO because "[a]t the time the building was purchased, the building was treated by both cities

4

as a building under the jurisdiction of the City of Beverly Hills for purposes of rent control; therefore, Ms. Kaye was not required to register with the City of Los Angeles."[3] The trial brief quoted from the deposition of a CBRE broker who represented Parklane. The brief explained the broker met with employees of both cities, obtained written documents from both cities, and spoke with Parklane, and all of these sources indicated the property was subject to Beverly Hills rent control.

The trial brief cited and attached documents demonstrating that both cities treated the property as subject to Beverly Hills rent control in 2003 through 2006, and Los Angeles did not declare the Roxbury property under its jurisdiction until December 2006. The various documents showed as follows. In a letter dated June 24, 2004, CBRE sent a package of materials to Kaye's agent for her due diligence review on the Roxbury property. The due diligence package enclosed information from both the City of Los Angeles and the City of Beverly Hills regarding rent control. CBRE stated in the letter: "According to Ozzy Beatriz at the City of Los Angeles Housing Department (213.808.8900), the owner of 484 S. Roxbury was paying the rent stabilization ordinance fees to the City of Los Angeles until the year 2000, when a refund of the fees for previous years was granted to the owner because the building was **not** subject to Los Angeles rent control. You should contact Mr. Beatriz to confirm this information."

The due diligence package enclosed work logs from the City of Los Angeles indicating that, as of 2003, the Roxbury property had an account in the Los Angeles rent stabilization system, but in or around December 2003, Beatriz closed the account because he determined the property was located in Beverly Hills, not Los Angeles. Beatriz stated in the work logs: "property is located on the border line of Los Angeles and Beverly Hills, 9 units are located on the city of los angeles (see county assess.), this prop is not

---

[3] To similar effect, the trial brief elsewhere stated: "The records clearly indicate that at the time the building was purchased, there was no requirement for Ms. Kaye to register the building with the City of Los Angeles."

5

subject to rent/scep because all record indicate property is in the county and not the city (beverly hills)." (*Sic*.)

The due diligence package also enclosed a December 2003 document from Los Angeles entitled, "Declaration of Registration/Systematic Code Enforcement Program (SCEP) Fee Payment Status." The declaration noted the Roxbury property "is in the City of Beverly Hills. Therefore the property is not subject to RSO . . . ." (Capitalization omitted.)

Additionally, the due diligence package enclosed a December 2003 letter from the City of Beverly Hills explaining the Roxbury property "is in Beverly Hills" and was "under Beverly Hills Rent Stabilization (rent control) as outlined in the City of Beverly Hills Municipal Code."

Another exhibit to the trial brief was a December 2006 letter from the Los Angeles Housing Department to Kaye. This was assertedly the first time Kaye learned the Roxbury property was subject to the Los Angeles RSO. The assistant director of the compliance division, James Hildebrandt, authored the letter. Kaye's claim of exemption from the RSO had been forwarded to him "for a formal status determination." He determined that, although the Roxbury property had a Beverly Hills mailing address, the majority of the property and rental units were in Los Angeles, and the property was therefore properly under the jurisdiction of Los Angeles. Hildebrandt was aware a Beverly Hills employee had come to the opposite conclusion "without rationale" in December 2003, and moreover, that Los Angeles staff had come to the same conclusion earlier. But "[r]egardless of these earlier opinions," Hildebrandt felt "the facts of the situation . . . do not support a determination other than that this property is rightfully regulated by the City of Los Angeles." Specifically, 70 percent of the land area of the parcel was in Los Angeles, and nine rental units were wholly on the Los Angeles side, while only four units were wholly on the Beverly Hills side, and three units straddled the boundary between Los Angeles and Beverly Hills.

Hildebrandt insisted Kaye pay registration and other fees for 2006 within 30 days, but "[r]ecognizing that the status of this property ha[d] been unclear for some time," he waived prior years' fees and late fees for 2006.

**b. Answer in *Sharp* Action**

CBRE contended Kaye made critical admissions in her answer in the *Sharp* action. First, she stated she "became aware by November 2004 that portions of the air conditioning system were not properly functioning and they needed to be replaced." Second, she alleged the application of the Los Angeles RSO to the Roxbury property was the "result of city zoning decisions."

**c. Trial Court's Phase One Ruling in *Sharp* Action**

After the phase one trial in the *Sharp* action, the court ruled in pertinent part that (1) the Roxbury property "is subject to the jurisdiction of the City of Los Angeles Rent Stabilization Ordinance ('RSO')" and (2) "Kaye was obligated to comply with the RSO beginning on December 8, 2006." As a result, Kaye had engaged in unlawful business practices under Business and Professions Code section 17200, and the tenants were entitled to restitution, including excess rent they had paid from December 8, 2006, forward.

**3. *Opposition Evidence***

Kaye's declaration in support of her opposition to the summary judgment motion explained that when she purchased the Roxbury property in 2004, CBRE marketed it as a Beverly Hills property with an address in Beverly Hills. The marketing materials included a pro forma income and expense analysis based on rent increases under Beverly Hills rent control. Those same increases would not have applied under the Los Angeles RSO. Before the sale of the property concluded, CBRE represented that it had conducted a due diligence investigation into the issue of rent control and sent Kaye a package of documents on June 24, 2004 (several of which we describe in part 2., *ante*). CBRE informed her that, regardless of the Roxbury property's straddling the border between Los Angeles and Beverly Hills, both cities considered it to be governed by Beverly Hills rent control. After Kaye purchased the property, she registered it with Beverly Hills and

7

pulled permits with Beverly Hills when she wanted to make improvements. Not until Hildebrandt's letter in December 2006 did Kaye receive notice that the Los Angeles RSO actually applied.

As to the HVAC-related representations, the disclosure documents CBRE provided to Kaye during the escrow process included an express representation that the HVAC system was free of defects. In 2004, after she purchased the property, she learned the condenser on the roof was leaking Freon. In her experience owning apartment buildings, it was not unusual for an air conditioning condenser to leak Freon. She replaced the condenser in early 2005 to resolve the problem. Late in 2006, her contractor explained to her for the first time that the HVAC system was designed for a 20-ton air conditioning compressor, and the system originally had two 10-ton air conditioning compressors. Her contractor reported that one of the 10-ton units had been removed from the building, and the lack of compressor capacity was causing the problems tenants were experiencing with their air conditioning. She had to purchase a new 10-ton compressor. Had Kaye known the building was missing a 10-ton compressor unit, she would not have paid as much as she did for the building.

### 4. *Summary Judgment Ruling*

The court granted CBRE's summary judgment motion. The court also granted CBRE's request for judicial notice of Kaye's answer and trial brief in the *Sharp* action "as to filing and existence only," noting that "[a]lthough the Court has not taken judicial notice of the truth of the matters in [these documents], the Court can and has considered them as judicial admissions." As to the phase one ruling in the *Sharp* action, the court granted the request for judicial notice "in full."

The court granted the motion as to the representations of rent control status for two independent reasons. First, CBRE established it did not misrepresent the rent control status of the building because, at the time Kaye purchased the Roxbury property, both cities treated the property as under the rent control jurisdiction of Beverly Hills. The court explained that Kaye had admitted so in her *Sharp* trial brief. Second, even assuming CBRE misrepresented the status of the property, the relevant statute of

8

limitations barred the causes of action. Kaye was on inquiry notice of the questionable nature of the property's rent control status as of June 2004, when materials in CBRE's due diligence package put her on such notice. The outside statute of limitations was three years (Code Civ. Proc., § 338, subd. (d)), but Kaye did not file suit until July 2008. The court held Kaye had not raised a triable issue of fact on either of these issues.

As to the HVAC representations, the court likewise held there were no triable issues of material fact. It concluded the relevant statute of limitations also barred these causes of action. Kaye's admissions in the *Sharp* action established she was aware in November 2004 (approximately four months after she purchased the property) of problems with the HVAC system. She was thus on inquiry notice at that time of the missing compressor unit and filed the complaint more than three years later.

Based on these rulings, the court held it was not required to reach the estoppel issues raised by the motion for summary judgment. The court entered judgment for CBRE, and Kaye timely appealed.

## STANDARD OF REVIEW

A court shall grant a motion for summary judgment if all the papers show there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) As the party moving for summary judgment, the defendant has the burden of establishing either (1) one or more elements of the plaintiff's cause of action cannot be established or (2) a complete affirmative defense to the cause of action exists. (Code Civ. Proc., § 437c, subds. (*o*)(1), (2), (p)(2).) To demonstrate the plaintiff cannot establish the elements of a cause of action, the defendant may show the plaintiff does not possess evidence needed to support a prima facie case and also cannot reasonably obtain the needed evidence. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854.) The defendant may also, but need not, present evidence conclusively negating an element of the cause of action. (*Ibid.*) Once the defendant has met its initial burden, the burden shifts to the plaintiff to produce evidence showing a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2).)

9

"On appeal from a summary judgment, our task is to independently determine whether an issue of material fact exists and whether the moving party was entitled to summary judgment as a matter of law." (*Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 444.) We resolve any evidentiary doubts or ambiguities in favor of the party opposing summary judgment. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) We may not decide the merits of disputed factual issues and may not weigh the parties' conflicting evidence to determine whose version is more likely true. (*Hernandez v. Department of Transportation* (2003) 114 Cal.App.4th 376, 388; *Kerns v. CSE Ins. Group* (2003) 106 Cal.App.4th 368, 396.)

## DISCUSSION

### 1. Representations Relating to the Rent Control Status of the Roxbury Property

Kaye's causes of action alleged CBRE knew the Roxbury property was subject to the Los Angeles RSO and not Beverly Hills rent control, yet CBRE intentionally or negligently failed to disclose this material fact and affirmatively misrepresented that Beverly Hills rent control applied. The trial court held CBRE established that it did not misrepresent the rent control status. We agree there is no triable issue of material fact on this point.

The undisputed evidence showed as follows. According to Kaye's declaration, she opened escrow on the Roxbury property in June 2004. CBRE marketed the property as a Beverly Hills property with a Beverly Hills address, and CBRE told her Beverly Hills rent control applied. But CBRE informed her that the property straddled the border between Los Angeles and Beverly Hills. It provided the due diligence documents to her on June 24, 2004, before the sale concluded. Her declaration does not attach a copy of the due diligence package she received. Her *Sharp* trial brief described the due diligence package, however, and attached some of the documents in that package.[4] The cover

---

[4] Specifically, the brief stated: "In June 2004, [CBRE] sent correspondence to [Kaye's broker] enclosing numerous documents related to the issue of which city

10

letter of the package informed her that the owner of the property had previously paid RSO fees to Los Angeles, but Parklane no longer paid such fees because it had been determined Los Angeles did not have jurisdiction. One of the documents in the package stated that a majority of the building's units (nine) were in Los Angeles. Other documents informed her Los Angeles had closed the property's account in 2003. Going back to Kaye's declaration, Los Angeles did not assert jurisdiction over the property for over two years while she owned it, and during that time she registered the property with Beverly Hills. In December 2006, she received the letter from Hildebrandt informing her Los Angeles would be asserting jurisdiction going forward.

In sum, the evidence showed Los Angeles did not assert jurisdiction over the property until two years after she purchased it. Thus, CBRE did not misrepresent the rent control status in saying Beverly Hills rent control applied at the time. Nor, as Kaye argues, did CBRE conceal information suggesting the rent control status was, at best, in doubt. Before the sale concluded, CBRE disclosed the border-straddling status of the property and disclosed that Los Angeles had asserted jurisdiction over the property not that long ago. The trial court did not err in finding Kaye could not establish a misrepresentation, an essential element of her causes of action. (Civ. Code, § 1710; *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173-174.)

Kaye argues the court erred in taking judicial notice of the *Sharp* trial brief, answer, and ruling. We disagree. The trial court properly took judicial notice of these documents. Evidence Code section 452, subdivision (d) defines court records as proper subjects of judicial notice. Thus, the court could take notice of the existence of these

---

maintained jurisdiction over the subject property for purposes of rent control. (See Exhibit 3001.1-3001.3.) The documents included: correspondence from the City of Los Angeles indicating that the City of Beverly Hills had jurisdiction, Los Angeles Housing Department notes from LAHD employees indicating that the City of Beverly Hills had jurisdiction over the building, and correspondence from the City of Beverly Hills indicating that the City of Beverly Hills had jurisdiction for purposes of rent control. (See Exhibits 3008.1, 3009.1, 3011.1, 3012.1, 3013.1 and 3016.1.)"

documents.  Taking judicial notice of the existence of a document is not the same as accepting the truth of its contents.  (*Herrera v. Deutsche Bank National Trust Co.* (2011) 196 Cal.App.4th 1366, 1375.)

Kaye asserts the court erred when it went even further—it accepted the *truth* of the statements or findings in these documents,[5] which constituted inadmissible hearsay. Even if the court accepted the truth of the statements, we are not treating them so.  The documents on which our ruling relies are the various due diligence documents attached to Kaye's *Sharp* trial brief.  The documents are not hearsay when not offered for the truth of their contents.  (Evid. Code, § 1200, subd. (a); *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 316.)  In a fraud and misrepresentation case, one of the operative facts is what the defendant communicated to the plaintiff.  (*Jazayeri v. Mao, supra*, 174 Cal.App.4th at p. 316.)  Thus, documents showing what the defendant said or wrote to the plaintiff are admissible not for the truth of their contents, but as original evidence.  (*Ibid*.)  The documents at issue constituted original evidence of CBRE's representations.  We are not considering the documents for their truth.

---

**5**     The court's summary judgment order did indeed suggest that it considered the truth of some of Kaye's statements in the *Sharp* brief and answer because they were "judicial admissions."  This mischaracterized the statements.  "'A judicial admission is a party's unequivocal concession of the truth of a matter, and removes the matter as an issue in the case.'"  (*Minish v. Hanuman Fellowship, supra*, 214 Cal.App.4th at p. 456.) A party may make judicial admissions in a pleading, by stipulation at trial, or in response to a request for admission.  (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 746.)  But "[n]ot every document filed by a party constitutes a pleading from which a judicial admission may be extracted."  (*Ibid.*)  Only complaints, demurrers, answers, and cross-complaints constitute pleadings.  (Code Civ. Proc., § 422.10.)  Furthermore, judicial admissions are conclusive and binding *only* in the particular case in which they are made.  (*Minish v. Hanuman Fellowship*, at p. 456.)  Accordingly, the statements in the *Sharp* trial brief were not judicial admissions because the trial brief was not a pleading.  Also, neither these statements nor the statements in the answer were judicial admissions in this case because Kaye made them in the *Sharp* action.

Moreover, Kaye cannot object to the due diligence documents attached to the *Sharp* trial brief as lacking a foundation of authenticity. "[A] document is authenticated when sufficient evidence has been produced to sustain a finding that the document is what it purports to be ([Evid. Code,] § 1400)." (*Jazayeri v. Mao, supra*, 174 Cal.App.4th at p. 321.) Evidence Code section 1414 provides: "A writing may be authenticated by evidence that: [¶] (a) The party against whom it is offered has at any time admitted its authenticity; or [¶] (b) The writing has been acted upon as authentic by the party against whom it is offered." Kaye acted upon the documents as authentic in the *Sharp* action. She attached them to her *Sharp* trial brief and used them as evidence to argue that, at the time she purchased the Roxbury property, both cities treated the property as subject to Beverly Hills's jurisdiction. And notably, she prevailed to the extent the *Sharp* court determined she did not have to comply with the Los Angeles RSO until Los Angeles unambiguously asserted jurisdiction in Hildebrandt's December 2006 letter. Raising an authenticity objection when she relied on the exact same documents in the *Sharp* action "is disingenuous." (*Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1527.)

Given our determination that CBRE negated an essential element of Kaye's case, we need not reach her argument that the court's alternative basis for granting summary judgment—the statute of limitations—was unsound.

## 2. *Representations Relating to the HVAC System*

CBRE argued below that the statute of limitations barred the causes of action for its alleged misrepresentations concerning the HVAC system, and the trial court granted the motion based on this argument. Unlike the trial court, we are not persuaded CBRE is entitled to judgment as a matter of law on this issue.

Kaye alleged that CBRE told her the Roxbury property was free of defects and included a fully functioning HVAC system, and she did not discover the system was defective until after her purchase. In moving for summary judgment, CBRE argued the statute of limitations began to run in November 2004 because Kaye was on inquiry notice of problems with the HVAC system then. CBRE's *sole* evidence was Kaye's admission in the *Sharp* answer that she "became aware by November 2004 that portions of the air

13

conditioning system were not properly functioning and they needed to be replaced."
Kaye filed the complaint in July 2008. CBRE argued the action was thus untimely under both the two-year statute of limitations for negligence and negligent misrepresentation by a real estate broker (Code Civ. Proc., § 339, subd. (1)) and the three-year statute of limitations for fraud and intentional misrepresentation (Code Civ. Proc., § 338, subd. (d)). The trial court agreed with CBRE and held Kaye was on inquiry notice as of November 2004.

"Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. . . . [T]he limitations period begins once the plaintiff ""'has notice or information of circumstances to put a reasonable person *on inquiry . . . .*"""' (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110-1111, fn. omitted.) "Resolution of the statute of limitations issue is normally a question of fact." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810.) "There are no hard and fast rules for determining what facts or circumstances will compel inquiry by the injured party and render him chargeable with knowledge. [Citation.] It is a question for the trier of fact." (*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 597.) When reasonable minds can draw only one conclusion from the evidence, however, the question becomes one of law that may be decided on summary judgment. (*Snow v. A. H. Robins Co.* (1985) 165 Cal.App.3d 120, 128.)

Here, we cannot say that reasonable minds can draw only one conclusion from the evidence. Kaye explained in her opposition declaration that the 2004 incident involved the condenser on the roof leaking Freon, which she fixed. Late in 2006, her contractor informed her for the first time of a different problem—that one of the required 10-ton compressors was removed from the HVAC system. CBRE presented no evidence whatsoever that a Freon leak in the condenser should put one on notice of an absent compressor. For example, there is no evidence about whether these two components were located near each other such that a visual inspection of the condenser would have tipped off a reasonable person that the compressor was missing; no contractor averred

14

that the two components are connected; and Kaye did not admit that she knew of problems with the compressor before late 2006. On this scant evidence, we decline to hold that one problem with the HVAC system would have put a reasonable person on notice of an entirely different problem, as a matter of law.

If Kaye did not have notice of the missing compressor until late 2006, as she declared, her complaint was timely in July 2008. CBRE had the burden of establishing this affirmative defense as the party moving for summary judgment. It failed to do so.

Although the trial court based its order solely on the statute of limitations, CBRE also argued the HVAC causes of action lacked merit because there was no admissible evidence that CBRE knew or should have known of any problems with the HVAC system. But CBRE did not carry its burden of showing Kaye could not establish this element of the causes of action. The record includes Kaye's responses to special interrogatories of CBRE (which were actually responses by Pringle, who had substituted in as bankruptcy trustee at this point). Some of the interrogatories related to the allegation in the TAC that the tenants of the Roxbury property complained to the previous owner of an improperly functioning HVAC system. One interrogatory asked Kaye to describe the facts evidencing her contention that CBRE knew or should have known tenants complained to the previous owner. The interrogatory responses stated that CBRE employees had previously examined the property, had been present during inspections, and were present when tenants complained of air conditioning problems to those who were inspecting the premises. The responses also identified particular tenants who had knowledge of these facts. Accordingly, CBRE failed to demonstrate Kaye did not possess evidence or could not reasonably obtain the evidence needed to establish that CBRE knew or should have known of problems with the HVAC system. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 854.)

### 3. *Summary Adjudication Proper*

The TAC combined in each cause of action two distinct wrongful acts—alleged misrepresentations regarding rent control status, and alleged misrepresentations regarding

15

the HVAC system. Because we hold CBRE should not have prevailed regarding the alleged HVAC misrepresentations, we must reverse the judgment.

CBRE moved in the alternative for summary adjudication on each issue. We shall accordingly direct the court to enter an order (1) granting summary adjudication for CBRE to the extent the causes of action are based on alleged misrepresentations of rent control status and (2) denying summary adjudication to the extent the causes of action are based on alleged misrepresentations about the HVAC system. (*Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854-1855 ["[A] party may present a motion for summary adjudication challenging a separate and distinct wrongful act even though combined with other wrongful acts alleged in the same cause of action," and the court may determine the merits of such a motion].)

## DISPOSITION

The judgment is reversed. The trial court shall enter a summary adjudication order consistent with the views expressed in this opinion. Appellant shall recover costs on appeal.[6]


                                        FLIER, J.

WE CONCUR:


        RUBIN, Acting P. J.              GRIMES, J.

---

**6** CBRE requested that we take judicial notice of the judgment and register of actions in the *Sharp* action, which were not part of the record in the trial court. We deny the request because the materials are unnecessary to the resolution of this appeal. (*St. Croix v. Superior Court* (2014) 228 Cal.App.4th 434, 447.)

16